UNITED STATES of America ex rel George Bradford Hunt, Walter W. Gauger and Joseph Piacentile Plaintiffs,

v.

MERCK–MEDCO MANAGED CARE, L.L.C. and Medco Health Solutions, Inc. et al. Defendants.

Nos. CIV.A.00–737, CIV.A.99–2332.

United States District Court, E.D. Pennsylvania.

Sept. 23, 2004.

432

Christopher Iannicelli, David S. Stone, Boies Schiller & Flexner LLP, Short Hills, NJ, Mitchell R. Kreindler, Kreindler & Associates, P.C., Houston, TX, Nancy J. Glidden, West Chester, PA, Richard Drubel, Boies Scheller & Flexner, Hanover, NH, James G. Sheehan, Mary Catherine Frye, Cathy Young Thomer, Patrick L. Meehan, United States Attorney's Office, Marc S. Raspanti, Michael A. Morse, Miller Alfano & Raspanti, P.C., Mary Catherine Frye, Assistant U.S. Attorney, Sonya Fair Lawrence, United States Attorney's Office Department of Justice, Philadelphia, PA, Sharon M. Gurak, Kreindler & Associates, P.C., Malvern, PA, Alison M. Duncan, Brian M. Castro, Robert T. Rhoad, Porter Wright Morris & Arthur LLP, Arthur J. Parker, Charlotte W. Parker, Sidney Rocke, Stuart I. Silverman, D.C. Office of the Inspector General, David Todd Shapiro, U.S. Dept. of Justice, Washington, DC, Patrick H. Haggerty, Philip E. Kessler, Porter Wright Morris & Arthur, LLP, Dayton, OH, Benjamin James Stevenson, Michael Kelley, Office of the Attorney General State of Florida, Tallahassee, FL, Patrick J. Keenan, Assistant Atty General, Chicago, IL, Michael K. Bassham, Peter M. Coughlan, Office of the Attorney General, Nashville, TN, Brian Sandoval, Attorney General of Nevada Carson City Office, Marie Martin–Kerr, Senior Deputy Attorney General, L. Timothy Terry, Office of the Attorney General, Carson City, NV, Betsy Whittey, Christopher K. Barry–Smith, Attorney General Office, Assistant Attorney General, Thomas Reilly, Office of the Attorney General, Attorney General of Massachusetts, Boston, MA, Gregory C. Fleming, Virginia Office of Attorney General, Richmond, VA, for Plaintiffs.

Janet C. Fisher, Laurie L. Carr, Enu Mainigi, William E. McDaniels, Williams & Connolly LLP, Washington, DC, Michael J. Holston, Drinker Biddle & Reath LLP, Nicholas M. Centrella, Conrad, O'Brien, Gellman and Rohn, P.C., Scott Godshall, List & List, Philadelphia, PA, Jack E. Fernandez, Simon Gaugush, Zuckerman Spaeder LLP, Tampa, FL, for Defendants.

## OPINION AND ORDER

NEWCOMER, Senior District Judge.

This is an intervened qui tam action in which relief under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, the Public Contracts Anti–Kickback Act ("AKA"), 41 U.S.C. § 51 *et seq.*, and the common law is sought.[1] Presently before this Court is Defendants' Motion to Dismiss.

### I. Procedural History

Plaintiffs, Relators Hunt, Gauger, and Piacentile, and the United States Government,[2] allege that Defendant Medco[3] systematically defrauded the Government through its relationship with Blue Cross Blue Shield Association ("Blue Cross"), a health plan that has contracted with the United States Government to provide healthcare to active and retired federal employees and their families. Additionally, the Government alleges that Medco violated the AKA when it both made and received payments for unfair favorable treatment with other companies and health plans. Plaintiffs also seek relief under numerous common law theories.[4] Medco has moved for dismissal of all claims based on Plaintiffs' failure to plead fraud with particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, and based on Plaintiffs' failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the same. Medco has also moved to dismiss two of Relators' claims pursuant to the public disclosure exception to the FCA.

For the reasons discussed below, Medco's Motion is denied with respect to every issue, with the exception of Plaintiffs' active and constructive fraud claims, which are dismissed, and Relators' drug-switching claims, which will require further briefing.[5]

### II. Facts and Background

Medco is a pharmacy benefit manager ("PBM")one of the largest in the United States. PBMs manage prescription drug benefits for health plans by providing, for example, mail order prescription drugs to plan beneficiaries, administrative services, and rebate and discount negotiations with manufacturers and pharmaceutical services. *Gov't Comp.* at ¶ 3, 4, 7, 8. Medco has contracted to provide PBM services to the patients of Blue Cross Blue Shield Association ("Blue Cross"), a health plan that contracts with the Government to provide health care to its employees, retirees, and their families, through the Federal Employee Health Benefits Program ("FEHBP"). Although the Complaints in this case have been crafted to encompass Medco's relationship with other healthcare providers, it is clear from the Govern-

---

1. The Plaintiffs in this case are the Relators and the U.S. Government; the Government and Relators both bring FCA and common law claims, but only the Government has alleged violations of the AKA. The Relators have also charged a myriad of violations of state laws, but those causes of action have either been settled, or are not relevant to this Opinion.

2. Collectively; the "Plaintiffs."

3. "Medco" includes all named Medco entities, collectively, not including Defendants Collins and Blyksal for the purposes of this Opinion.

4. The Government's Fraud Injunction Act claims were settled prior to this Opinion.

5. A small forest has been devoured on the Parties' voluminous, but superbly written, motions and briefs. In this Opinion, the Court considers the Relators' and Government's Complaints, Medco's Motion to Dismiss ("Medco's Motion"), the Government's Response, the Relators' Response, Medco's Reply, the Government's Sur–Reply, and Medco's Response to the Government's Sur–Reply. Individual Defendants Robert Blyksal and Diane Collins have also filed Motions to Dismiss; they will be dealt with in a separate Order.

ment's Response to Medco's Motion that it is only Medco's relationship with Blue Cross that is actually at issue in this case. *See Gov't Resp.* at 2 ("Medco provides mail order prescription drug services to members of the [FEHBP] managed by [Blue Cross]."), throughout (relying exclusively on the Government's contract with Blue Cross).

### a. *False Claims Act Claims*

The Government provides subsidized health insurance to its employees and their families through the FEHBP, established by Congress in 1959. 5 U.S.C. § 8901 *et seq.* Through the Office of Personnel Management ("OPM"), the Government contracts with private health plans to deliver health benefits to its employees. Monies for the FEHBP are maintained in the Employees Health Benefits Fund ("Health Fund"), and are administered by OPM. 5 U.S.C. § 8909. Federal agencies and their employees contribute to the Health Fund to cover the total cost of health care premiums. 5 U.S.C. § 8906. With some limitations, 5 U.S.C. § 8906 sets the Government's share of contributions to the Health Fund at between 72 and 75 percent of the weighted average of subscription charges for all health plans, as determined by OPM. 5 U.S.C. § 8906(a), (b). These contributions, combined with the employee's

share, are used to pay for healthcare for the Government's employees.

The Health Fund is split into three parts: (1) a letter of credit ("LOC") account, (2) a contingency reserve for each carrier, and (3) an account to cover administrative expenses. 5 U.S.C. § 8909(a), (b). The LOC account is used to pay carriers for their claims and administrative expenses. 48 C.F.R. § 1602.170–10. The contingency reserve account is not immediately accessible by the carriers (it is to this account that the Government claims the carriers must deposit any contractual penalties that they receive). *Gov't Resp.* at 8. If there is money remaining in the LOC account at the year's end, it is used to pay future claims. If money remains in the contingency reserve account at year's end, it is used to "defray increases in future rates, or may be applied to reduce the contributions of enrollees and the Government to, or to increase the benefits provided by, the plan from which the reserves are derived . . . ." 5 U.S.C. § 8909(b).

It is claimed that OPM generally employs two types of contracts to govern its relationship with carriers: experience-rated and community-rated. 48 C.F.R. § 1616.7001, 1616.7002. To simplify somewhat for the purposes of this Opinion, experience-rated contracts reimburse carriers on a costs-incurred basis, while community-rated contracts pay carriers a fixed monthly rate, regardless of the actual costs the carrier incurs in the operation of its program.[6] It is alleged that Medco and

---

**6.** Medco, in its initial Motion, apparently relied upon a model community-rated contract, while the actual contract between Blue Cross (the carrier that hired Medco) and OPM is experience-rated. Because community-rated carriers are generally paid a fixed monthly-premium, Medco argues, false claims that inflate the cost of medical services harm only the carrier's profits, and not the Government, because the Government's maximum contribution to the carrier will not change (in a given year) depending on the actual costs of delivering health care. To the extent that this argument relies on the wrong type of contract, it must, of course, be rejected. The

Court notes, however, that even if Blue Cross did have a community-rated contract with OPM, it is not technically impossible that Medco's alleged conduct could harm the Government—if, for example, Medco's conduct increased the costs to the carrier such that the carrier increased its charges, the Government could be harmed (the next year) because these increased charges would artificially inflate the weighted average subscription charges that the Government must pay a portion of under 5 U.S.C. § 8906. As the contract at issue is claimed to be an experience-rated one, Medco's charges to Blue Cross are paid by the plan, then reimbursed out of the

Blue Cross have a contractual relationship whereby Medco has made certain performance guarantees. Failure to meet these performance guarantees can influence whether Medco's contract is renewed, and in most cases will result in penalties paid, through Blue Cross, to the Government. In some cases, Medco has agreed not to charge for services that were not provided in accordance with state law. In others, Medco has agreed to pay a penalty for each occurrence of noncompliance after a set threshold is met. The crux of Plaintiffs' FCA claims grow out of Medco's alleged billing for services not rendered and fraudulent avoidance of contractual penalties.

Plaintiffs allege that Medco made false statements and cancelled or destroyed mail order prescriptions to avoid paying penalties for delays in filling orders (*See Gov't Comp.* at ¶ 38, 96–102, 125–129), billed for prescriptions containing less then the required number of pills (*Id.* at ¶¶ 103–124), created false records showing that physicians had been contacted to discuss various issues when no such contacts took pace (*See id.* at ¶¶ 76–95, 130–136), billed the Government for prescriptions not authorized by law to be filled (*See id.* at ¶¶ 130–136), fraudulently induced physicians to authorize drug switches (*Id.* at ¶¶ 138–149), and favored Merck drugs over other manufacturers' even though Merck drugs were more expensive (*Id.* at ¶ 137).

Plaintiffs claim that Medco's conduct would have harmed, could have harmed, and/or did harm the federal fisc. Plaintiffs' claim that the above conduct violated 31 U.S.C. § 3729(a)(1), prohibiting false or fraudulent claims against the United States, (2), prohibiting the use of a false record or statement employed to get a false claim paid, and (7), prohibiting the

employment of a false record or statement to reduce an obligation owed to the United States. Medco challenges these allegations on Rule 9(b) and Rule 12(b)(6) grounds.

### b. *Anti–Kickback Act Claims*

Plaintiffs allege two grounds for AKA liability: (1) that Medco paid $87.4 million to a Corporation to ensure that it relief exclusively on Medco's services, and (2) that Medco received millions of dollars from drug manufacturers to favor their drugs. *Gov't Comp.* at ¶¶ 150–157. Medco challenges these allegations on Rule 12(b)(6) grounds.

### c. *Common Law Claims*

Plaintiffs also allege a panoply of common law claims, including active and constructive fraud, payment by mistake of fact, and unjust enrichment. Medco challenges these allegations on Rule 9(b) and Rule 12(b)(6) grounds.

### III. *Standard of Review*

### a. *Fed.R.Civ.P. 9(b)*

Rule 9(b) requires that claims of fraud be pleaded with particularity. This requirement applies to cases brought under the FCA, and for claims of common law fraud. *United States ex rel. LaCorte v. SmithKline Beecham Clinical Laboratories, Inc.*, 149 F.3d 227, 234 (3d Cir.1998) ("[9(b)] requires plaintiffs to plead fraud with particularity, specifying the time, place and substance of the defendant's alleged conduct."). Rule 9(b) is to be read in conjunction with Rule 8, which requires pleadings to be as simple and concise as possible.

Health Fund's LOC account. As the plans have no claim to money not spent in the LOC account, and as leftover funds in the LOC account are used to offset future costs, claims made against it quite directly impact the federal fisc.

Rule 9(b) is generally considered satisfied when a defendant has 'fair notice' of the charges against it. *United States v. Kensington Hospital*, 760 F.Supp. 1120, 1126 (E.D.Pa.1991). A plaintiff "cannot be expected to have personal knowledge of the details of corporate internal affairs" in corporate fraud cases. *In re Craftmatic Securities Litigation*, 890 F.2d 628, 645 (3d Cir.1989). Rather, the Court will be satisfied when, on the face of the pleadings it can fairly be said that a defendant is capable of mustering a full defense. In this Circuit, a plaintiff has satisfied Rule 9(b) when he has alleged "circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *United States ex rel. Atkinson v. Pennsylvania Shipbuilding Co. et al.*, No. 94–7316, 2000 WL 1207162 at *8, 2000 U.S. Dist. LEXIS 12081 at *32 (E.D.Pa. Aug. 24, 2000) (citing *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir.1984)).

### b. *Fed.R.Civ.P. 12(b)(6)*

"The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of a complaint." *Trinsey v. Mitchell*, 851 F.Supp. 167, 169 (E.D.Pa.1994). When deciding a Rule 12(b)(6) motion, a Court must accord the non-movant every favorable inference, granting the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–6, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "Like a battlefield surgeon sorting the hopeful from the hopeless, a motion to dismiss invokes a form of legal triage, a parting of viable claims from those doomed by law." *Iacampo v. Hasbro, Inc.*, 929 F.Supp. 562, 567 (D.R.I. 1996). A court should not dismiss a complaint unless it "clearly appears that no

relief can be granted under any set of facts that could be proved consistently with the plaintiff's allegations." *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir.1994) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). Medco's arguments, therefore, will be heavily scrutinized.

### IV. *Analysis*

#### a. *FCA Claims*

##### i. *Sufficiency of the Allegations*

Medco argues that Plaintiffs' FCA allegations fail to meet the requirements of Fed.R.Civ.P. 9(b). The Court disagrees. Plaintiffs' Complaints are not organized effectively, and they fail to distinguish between different sections of the FCA. However, as evidenced by its 55–page Motion to Dismiss, Medco has clearly received notice sufficient to allow it to scour its own history of conduct and muster a defense.

The scope of the complained-of conduct is vast, and occurred over a long period of time—but Plaintiffs have provided Medco with sufficient guidance, and are not required to provide more. The Complaints specify the general time frame over which Medco's conduct allegedly occurred (*Gov't Comp.* at ¶ 1), what contracts were involved (*Gov't Comp.* at ¶ 3), and what claims were false (*Gov't Comp.* throughout). The Court is troubled by Plaintiffs' failure to tie allegations of specific conduct to individual sections of the FCA, but the Court has been able to unravel Plaintiffs' claims, so there is no reason that Medco cannot. Moreover, on this point, it seems clear to the Court that, if anything, Plaintiffs' failure is not one involving lack of specificity, but rather one of poor organization. Poor organization alone is not grounds for dismissal under Rule 9(b), although Plaintiffs will certainly be required

to refine their allegations as trial day approaches, if for no other reason then to calculate damages. As Medco has received fair notice of the charges against it, its Motion to Dismiss Plaintiffs' FCA claims based on Rule 9(b) is denied.

### ii. Failure to State a Claim

#### a. 31 U.S.C. § 3729(a)(1) and (a)(2)

The elements of a claim under § 3729(a)(1) are that

(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent.

*Hutchins v. Wilentz, Goldman & Spitzer,* 253 F.3d 176, 182 (3d Cir.2001), *cert. denied,* 536 U.S. 906, 122 S.Ct. 2360, 153 L.Ed.2d 182 (2002). To state a claim under 31 U.S.C. § 3729(a)(2), a plaintiff must allege (1) the defendant made, used, or caused to be made or used, a record or statement to get a claim against the United States paid or approved; (2) the record or statement and the claim were false or fraudulent; (3) the defendant knew that the record or statement and the claim were false or fraudulent; and (4) the United States suffered damages as a result. *United States ex re. Showell v. Philadelphia AFL, CIO Hospital Association,* 2000 WL 424274, at *5 (E.D.Pa. Apr.18, 2000). Under § (a)(1), a plaintiff need not plead that the false claims at issue actually harmed the government—merely that the statements would have and could have. Under § (a)(2), a plaintiff must allege that the United States actually suffered harm. Medco challenges Plaintiffs' allegations on every element of their § (a)(1) and § (a)(2) claims, and further argues (incorrectly) that the Government must, as a matter of law, actually suffer economic loss for a § (a)(1) claim to be viable. The Court will deal with each element individually.

#### 1. Presentation of Claims and/or Statements

The Government's Complaint sufficiently alleges that Medco "caused to be presented to an agent of the United States a claim for payment." *Gov't Comp.* at ¶ 10 (Blue Cross was an agent of the United States), ¶ 182 (Medco bills Blue Cross for services rendered to federal beneficiaries, and the United States reimburses Blue Cross). Additionally, the Government's Complaint alleges throughout that Medco used false records or statements in support of their allegedly false claims (*Gov't Comp.* at ¶ 27, 38, 82, 92(a), 92(c), 92(d), 98, 99, 112, 129, 136, and 137). These allegations are sufficient to satisfy the requirements of § 3729(a)(1) and (a)(2).

#### 2. False or Fraudulent

Plaintiffs have sufficiently alleged numerous false or fraudulent statements by Medco. Specifically, the Government has alleged that Medco submitted annual certifications to Blue Cross that were untrue (¶ 38) and that Medco submitted claims for payment for services that were not rendered or that were not performed in accordance with contractual requirements (¶ 84, 95, 102, 124, 176). Additionally, the Government has repeatedly alleged that Medco submitted records and statements that it knew were false in support of its false claims. Medco argues that, even if Plaintiffs' allegations are true, their allegations would not rise to the level of actionable fraud. The Court disagrees. The FCA reaches "all fraudulent attempts to cause the Government to pay out sums of money." *Hutchins,* 253 F.3d at 183 (citing *United States v. Neifert–White Co.,* 390 U.S. 228, 233, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968)).

Medco billed Blue Cross and hence the Government for services it was required to render in accordance with its contract and with state law—any claims submitted that do not fulfill these prerequisites are false. In some cases, such as the drug shorting allegations, Medco allegedly billed for products that it simply did not provide. If the allegations are true, these bills could form the basis of a false claim. Moreover, Medco was required to submit certifications of its performance which were used to assess contractual penalties and to determine whether its contract with Blue Cross would be renewed. To the extent that these certifications were false, they could have fraudulently induced Blue Cross to renew its contract with Medco.[7]

As the Government's allegations of fraud fall into six broad categories, the Court will deal with each in turn.

### A. Turnaround Time

■■■ The Government claims that Medco's Annual Statement (required by ¶ 5.1 of Schedule C of the 1999 Blue Cross—Medco Contract)[8] was a false claim because it failed to identify contractual penalties that Medco owed Blue Cross for failure to meet contractually-required turnaround time requirements—meaning that Medco was billing Blue Cross for more than it was entitled. The Government argues that false records made to cover up this noncompliance are actionable under § (a)(2), and that these same statements and records violate § (a)(7) (discussed below) because they avoid the payment of contractual penal-

ties. The Government alleges that patients were lied to if they inquired into the status of their prescriptions (*Gov't Comp.* at ¶ 99), and that Medco created false records to indicate that prescriptions were being delivered on time. *Id.* at ¶ 46. This conduct was allegedly used to hide Medco's failure to meet its contractual performance standards, reducing or eliminating contractual penalties and facilitating false certifications of compliance. Medco urges that, as the Complaints contain no specific false statements, Plaintiffs' claims must fail. The Court disagrees.

The allegations in the Complaints take place over a long period of time, and each false record generated by the schemes at issue could be independently actionable under the FCA. Plaintiffs cannot be expected to allege every single false statement that was created as a result of the alleged scheme, particularly in a case such as this where they are numerous. The Court is satisfied with Plaintiffs' description of Medco's system of creating false records and statements. Plaintiffs need not specifically allege each individual falsely cancelled prescription to proceed past the instant Motion.

### B. Drug Switching

■■■ The Court accepts the Government's argument that "[a]ny claim submitted by Medco for a prescription drug dispensed without specific physician authorization is a false claim." *Gov't Resp.* at 36. Under Medco's contract with Blue Cross, Medco agreed to only submit

---

7. The Court is aware of the problems of proof and causation that this theory of fraud would invite.

8. When considering a motion for relief under Fed.R.Civ.P. 12(b)(6), a court may consider documents that form the basis of the allegations in a complaint. *Pension Benefit Guaranty Corp. v. White Consolidated Industries,*

998 F.2d 1192, 1196 (3d Cir.1993). Where appropriate, this Court has turned to the contracts between OPM and Blue Cross, attached as Exhibit A to the Government's Response ("Blue Cross–OPM Contract"), and the contract between Blue Cross and Medco, attached as Exhibit B ("Blue Cross–Medco Contract").

440

charges for drugs that were dispensed in accordance with the applicable prescriptions, state laws, and regulations. To the extent that Medco switched drugs in knowing violation of state law or its contractual obligations, then submitted charges for the switched drugs, it has violated § (a)(1). To the extent that Medco made false statements or records in support of these false claims, and that the Government was harmed, it has violated § (a)(2). As discussed above, the Government has alleged that Medco had a system and policy of switching drugs under misleading or false circumstances, then creating false records to cover up the sham. *Gov't Comp.* at ¶ 137. The detail in which Plaintiffs have discussed Medco's alleged policies is sufficient to obviate the need for specific false statements—because false statements and records are the clear consequence of the scheme that the Plaintiffs describe.

## C. Drug Shorting

Plaintiffs allege that Medco charged for drugs that it did not deliver. *Gov't Comp.* at ¶ 103–124. The Government's Complaint speaks specifically of the Las Vegas pharmacy (¶ 106), cites specific dates (¶ 108), and discusses the specific conduct which is alleged to have caused the drug shorting. It seems clear to this Court that any drugs charged for and not delivered are potential violations of § (a)(1). The Court sees no need to spend any more time on this well-pleaded claim.

## D. Drug Utilization Review

Medco's provider reimbursement is allegedly based on properly performed Drug Utilization Review ("DUR"). *Gov't Comp.* at ¶ 84. If Medco did not adequately perform its DUR obligations yet charged for said services, Medco has made potentially false claims. The Government Complaint charges that Medco fabricated records to cover up the fact that DUR calls were not

being made (*Gov't Comp.* at ¶ 82). To the extent that this is true, and that the Government was harmed, Plaintiffs have identified potentially false claims under § (a)(2).

## E. Doctor Call Services

■ The Government's Complaint alleges that under Florida state law (and under other states' laws), a pharmacist cannot dispense drugs to a patient unless, prior to the transfer of the drug, a number of safeguards are completed. *Gov't Comp.* at ¶ 16. The Government Complaint further alleges that non-pharmacist employees performed, or helped perform, those tasks which state law specifically mandates a pharmacist perform. *Id.* at ¶ 24, 85–95. As discussed *supra,* if Medco is forbidden from charging for prescriptions not submitted in accordance with state law, then, any charges not formulated in accordance with state law, would be false and actionable under the FCA.

## F. Customer Service Allegations

Plaintiffs' have alleged that Medco's customer service representatives made knowingly false statements to customers who complained about prescription errors in order to help Medco avoid contractual penalties, have their contract renewed, and bill for goods not delivered. Again, the Court will not force Plaintiffs to allege each individual communication with specificity in their Complaints; the alleged scheme is sufficient.

## 3. Scienter

■ To make its prima facie case, a FCA plaintiff must allege that the defendant, at the time it submitted its false or fraudulent claims, (1)[had] actual knowledge of the information; or (2) act[ed] in reckless disregard of the truth or falsity of the information" alleged to be false. 31 U.S.C. § 3729(b). Plaintiffs have suffi-

ciently alleged that Medco submitted its false claims knowingly under this definition. At the very least, the Government has claimed that Medco's compliance programs were either non-existent or insufficient, in satisfaction of the "reckless" requirements of § 3729(b). With respect to some specific schemes, the Government has pleaded actual knowledge (*see Gov't Comp.* at ¶ 38, alleging that Medco officials knowingly destroyed prescriptions)—but the Court need not detail each of these allegations as it is satisfied with the Government's general allegations of knowledge.

### 4. Harm

Medco claims that (1) Plaintiffs have not pleaded that its allegedly false claims caused economic harm to the federal fisc, and moreover that (2) because of the way the FEHBP is funded, it would be legally impossible for Medco's alleged wrongdoing to do the same. As discussed below, this Court finds that a FCA plaintiff bringing claims under 31 U.S.C. § 3729(a)(1) must prove that a defendant's conduct caused, or would have caused, economic loss to the Government; the Court also finds that Plaintiffs met their pleading requirements in the instant case with respect to 31 U.S.C. § 3729(a)(1), (2), and (7).

### A. 31 U.S.C. § 3729(a)(1) Requires That a Defendant's Conduct Harmed, or Would Have Harmed, the Government, as 31 U.S.C. § 3729(a)(2) Requires Actual Harm to the Government

■■■ The FCA only reaches conduct that causes, or could cause, the government economic loss. *Hutchins,* 253 F.3d

at 183–84. False statements that do not and would not, or could not, cause the Government to make a payment (or other transfer of property) are not independently actionable under the FCA. *Hutchins* at 184 ("[the FCA] was not intended to impose liability for every false statement made to the government.").

■■■ The FCA is a statute designed to protect the Government's coffers from fraud and from attempted fraud. Thus, a causal link between a false claim and economic harm must be possible, plausible, and pleaded, even though the claim need not actually be *paid* for liability to attach under specific provisions of the FCA (i.e. 31 U.S.C. § 3729(a)(1)). Rather, to avoid dismissal a complaint must allege that, at the very least, the Government could have been harmed. Medco is, in this respect, quite incorrect in its statement that "damages and loss causation are preconditions of FCA liability." *Medco Reply* at 5. Medco has craftily blurred the distinction between different provisions of the FCA—specifically, between § 3729(a)(1) and (2). Although *every* FCA claim does not hinge upon the Government suffering monetary damages, liability attaches if a demand for money has been made on the government, the government "has been billed for nonexistent or worthless goods, [or] charged exorbitant prices, *or the fraud might* cause the government to suffer economic loss." *United States ex rel Watson v. Connecticut General Life Ins. Co.,* 87 Fed. Appx. 257, 260 (3d Cir.2004) (emphasis added). The law in the Third Circuit is settled that a claim brought under 31 U.S.C. § 3729(a)(1) need not actually be paid to be actionable.[9]

9. Medco has obfuscated this issue significantly in its prior pleadings; *see Medco Reply* at 5 ("both damages and loss causation are preconditions to FCA liability."), *Medco Motion* at 19 ("[a]s such, there can be no liability under 31 U.S.C. §§ 3729(a)(1) or (a)(2)—both of which require submission of a false 'claim' that causes the government to pay out money"—emphasis in original). In its final volley, Medco explicitly acknowledges that a false claim need not actually cause the Gov-

Because a claim need not be paid to be actionable, a plaintiff does not, as a concrete rule, need to plead damages and causation to proceed in every case. The false claims complained of, however, must be of a sort that *could* result in a financial loss for the Government—for as the Third Circuit has instructed us, claims that "do not or would not cause financial loss to the government are not within the purview of the [FCA]." *Hutchins,* 253 F.3d at 183–4. Therefore, Plaintiffs must plead that the false statements complained of are capable of causing the Government financial loss, even if it has not actually suffered any. In this case, Plaintiffs have adequately pleaded that Medco's conduct harmed, or could have harmed, the Government.

### B. The Government Has Alleged That Medco's Claims Harmed the Government

In the instant case, the Government's Complaint does contain allegations that Medco's allegedly false statements did and would have caused the Government financial harm. For example, in ¶ 95 of its Complaint, the Government alleges that Medco charged for services not rendered. In ¶ 102, the Government claims that Medco billed for services not performed, and in ¶ 124, the Government accuses Medco of failing to correct its billings for shortened prescriptions or dispensing errors. Plaintiffs have thus satisfied their burden, assuming that the conduct they complain of is capable of harming the federal fisc. As discussed below, the Court finds that it is.

### C. It is possible that the Government was harmed by Medco's Alleged Conduct

A plaintiff bringing claims under § 3729(a)(1) must allege that a defendant's false claims did, or would have, caused financial loss to the Government. In con-

ernment financial harm to be actionable un-

trast, a plaintiff bringing claims under § 3729(a)(2) must show that the government actually suffered damages. Implicit in both of these requirements is that the claims *could* have caused a financial loss to the government.

 The Government argues, and the Court agrees, that the federal fisc has been harmed even if the exclusive damage done by Medco's alleged acts was to reduce the amount of money available for the FEHBP in the future. Accepting Medco's argument would mean that any government program that involved a fixed annual contribution from the Government would be completely immune from claims of abuse; that Congress would have the FCA turn a blind eye to such behavior is simply inconceivable to this Court. Discussing an older version of the FCA, the Supreme Court noted that "[i]t seems quite clear that the objective of Congress was broadly to protect the funds and property of the Government from fraudulent claims." *Rainwater v. United States,* 356 U.S. 590, 592, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958). The Government does not take any leftover funds in the FEHBP accounts and simply burn them for the taxpayers' amusement; sooner or later, those funds must be put to some use. Medco notes that the Government's contribution to the FEHBP is a statistically weighted average of the past years' subscription costs—but if Medco's false claims wrongly inflated subscription costs, the Government's contributions would rise prematurely in the following year. This is sufficient harm to allow the Government to proceed.

Medco argues that no amount of false claims could actually harm the Government, because said claims would not result in an immediate increase in the Government's contribution to the FEHBP. In

der § 3729(a)(1). *Medco Sur–Reply* at 2–4.

*United States ex rel. Yesudian v. Howard University et al.,* 153 F.3d 731 (D.C.Cir. 1998), the court of appeals affirmed a district court judge's rejection of a defense similar to Medco's. In that case, Daniel Yesudian sued Howard University after he was fired for (allegedly) pointing out financial improprieties involving the University's federal grants. Because Yesudian sought relief under the FCA's anti-retaliation provisions, 31 U.S.C. § 3730(h), whether or not there could have been any predicate FCA violation was an issue in the case. In concluding that fixed-grant programs can be the subject of FCA liability, the court noted that:

[T]he Senate Judiciary Committee made clear that it intended the concept of loss to the United States to be considered broadly. As the Committee noted, the Seventh Circuit had held in *United States v. Azzarelli Construction Co.,* 647 F.2d 757 (7th Cir.1981), that there was no loss to the United States, and hence no viable False Claims Act suit, where the federal government had contributed a fixed sum to Illinois for highway projects and thus would have paid out the same amount regardless whether contractors submitted false claims to the State. The Committee made clear it disapproved of this result, and expressly "intended the [new subsection of the FCA defining 'claim']... to overrule *Azzarelli* and similar cases which have limited the ability of the United States to use the act to reach fraud perpetrated on federal grantees, contractors or other recipients of Federal funds." S. REP. NO. 99–345, at 22, *reprinted* in 1986 U.S.C.C.A.N. at 5287.

Congress, then, plainly regarded a false claim as causing a loss to the United States in the *Azzarelli* situation, notwithstanding that the false claim would not lead to an additional pay-out of federal funds. Much the same is true here. Whether or not the United States Government would be out *additional* money beyond that already appropriated for Howard, it would suffer a loss if the money appropriated for legitimate purposes were instead wasted on a false claim.

*Id.* at 739. In the instant case, Plaintiffs argue that the Government suffers a loss if the money it has appropriated for employee health care is wasted on illegitimate claims. Given the above discussion, the Court is obliged to agree.

5. "To the Government"

In its Motion, Medco argues that it could not have submitted false claims "to an officer or employee of the United States Government," as required by 31 U.S.C. § 3729(a)(1). As Medco correctly notes, despite the fact that 31 U.S.C. § 3729(c) broadly defines "claim" to include claims submitted to recipients of federal money, this requirement does not relieve a plaintiff from showing that the claim ultimately was or would have been submitted to the Government. Under Medco's reading of the structure of the FEHBP, none of its claims are ever presented to the Government. Rather, Medco submits its claims to Blue Cross, who pays Medco out of its plan funds. *Medco Mot'n* at 20. The Government contests this reading of the statute as overly simplistic and urges a contrary result. "The Blue Cross Association pays Medco based upon actual benefit claims data and then the Blue Cross Association draws down from its LOC Account to cover the costs." *Gov't Resp.* at 12. Medco, therefore, causes Blue Cross to submit its claims to the Government, at least according to Plaintiffs.

In its initial Motion, Medco focused on its characterization of the Government's relationship with Blue Cross—noting that under a community-rated contract, the carrier is exclusively responsible for Medco's reimbursement. *Medco Mot'n* at 21 ("the

Plan does not then submit that claim to the government for reimbursement."). In its Reply, Medco broadens (or perhaps salvages) its argument to claim that there is no submission to the Government because Blue Cross uses a draw-down account for reimbursement. There has been no briefing on how much discretion Blue Cross has in charging a payment to Medco against its LOC account, but the mere fact that the account may not be one in which a federal officer has complete discretion must not be dispositive. Medco recites developing law in this area, but ultimately its argument turns on the character of the LOC account. Although discovery may (but will likely not) alter the Court's analysis on this point, the Government's claims are, at this point, sound enough to survive a motion to dismiss.

### b. 31 U.S.C. ¶ 3729(a)(7) Claims

To show liability under 31 U.S.C. § 3729(a)(7), a plaintiff must demonstrate that a defendant "knowingly makes, uses or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the [g]overnment." Medco contests Plaintiffs' § (a)(7) claims on three grounds: (1) that Medco did not owe an obligation to the Government, (2) that, even if Medco did owe an obligation to the Government, the statute would not apply because the obligations did not exist at the time the allegedly false statements were made to avoid it, and (3) that Plaintiffs do not, and cannot, allege that the government was harmed by any reverse false claims. The Court deals with these arguments in turn.

### 1. Privity

Medco first argues that the language of § 3729(a)(7) requires that obligation be owed directly to the Government, with no intermediate actors. The Court does not find support for this "direct privity" argument on the face of the statute. The text of the statute states that a party may be liable if they "cause to be made or used" a false statement which deprives the Government of any part of an obligation owed it. 31 U.S.C. § 3729(a)(7). The fact that Medco may not have been in direct contractual privity with the Government, therefore, is not an automatic bar to § 3729(a)(7) liability. The Government argues that any contractual penalties owing from Medco to Blue Cross are required by law to be turned over to the Government, rendering the distinction between Medco and Blue Cross legally worthless. *Gov't Resp.* at 54, citing 48 C.F.R. § 1631.201–70. The Court agrees. If Medco's actions had the predictable consequence of depriving the Government of money it was owed, then Medco was acting (or failing to act) within the ambit of § 3729(a)(7).

The Court recognizes that there is a virtual absence of precedent on this issue, and that the question at hand is a novel one. It seems to this Court, however, that Medco was in a unique relationship with the Government whereby the predictable, even certain, consequence of its actions (or inactions) would and could be to reduce the amount of money owed to a party (Blue Cross) that it knew was in direct contractual privity with the Government. In fact, page one of the Blue Cross–Medco Contract explicitly discloses that the Government and its employees are the ultimate beneficiaries of Medco's relationship with Blue Cross.[10] It does not seem fair or

**10.** *Blue Cross–Medco Contract* at 1 ("WHEREAS, [Blue Cross] ... has entered into Contract No. CS 1039 ... with [OPM] ... to provide certain health benefits to eligible federal employees ... as authorized by [the FEHBP] ....").

proper to this Court to allow Medco to escape liability on this claim merely because they allegedly caused another party to avoid making payments to the Government. Additionally, as the Government points out, ruling for Medco on this point might ignore the regular business practices of the Parties. Because of this, and because there is no "directness" requirement in the text of the statute, the Court will reject Medco's arguments.

### 2. Contractual Penalty Payments

Medco argues that its obligation to make good on its contractual penalties accrues at, and not until, the end of each contract year. *Medco Motion* at 24, n. 31. It is not, Medco urges, until that time that Medco's penalties would become contractual obligations owed to Blue Cross, and hence the Government. The Court agrees with Medco's reasoning, but disagrees with their proposed result. As Medco notes, "[t]he obligation cannot be merely a potential liability: instead ... a defendant must have had a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness." *United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 773 (8th Cir.1997). But there is a difference between a penalty being "due and payable" and a penalty being incurred. The contract language that Medco cites indicates that it is not until the end of a year that Medco must make good on the penalties it has incurred. *See Blue Cross–Medco Contract*, Schedule C, § 3.2. Medco, in other words, incurs the obligation to pay a penal-

ty when its conduct falls below specific contractual obligations, and when there is a contractual provision specifying that such conduct will incur a penalty. A brief inspection of the Medco–BCBSA Contract yields an excellent example: "Medco *shall* pay to BCBSA a penalty equal to $3.50 for each prescription ... in excess of 2.5% of the prescriptions received on [a] business day, that [were] not Dispensed or Returned to the member within 5 business days as described above." *Blue Cross–Medco Contract* at § 2.2.4. The Complaint alleges that Medco made false statements to cover up failure to abide by this provision. This concept is entirely distinct from the due-date for penalty payments, discussed later in the Medco–BCBSA Contract.

The instant that Medco's conduct falls below that contractually required of it, a penalty slams into place through the operation of the contract, without regard to *when* the penalty must be paid. Any effort by Medco to cover-up its failure, therefore, are efforts that "conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government," in violation of 31 U.S.C. § 3729(a)(7).[11]

### 3. Harm

Medco finally claims that, even if it did engage in the conduct the Government complains of, its conduct would not result in harm to the federal fisc. Medco relies on the same line of cases that this Court discusses above to show that the Government must show harm to proceed. As

11. The Court notes that many contractual penalties may be contingent on, for example, more than a certain percentage of prescriptions going unfilled. *See* Medco–BCBSA Contract § 2.2.4 (penalties accrue when more then 2.5% of prescriptions are not filled within a certain time frame). In this respect, Plaintiffs will certainly need to prove that more then 2.5% of the prescriptions in ques-

tion were not filled—and further, to show actual damages in this example, they will need to deduce the number of prescriptions over 2.5% that were not filled in accordance with the Blue Cross–Medco Contract. This will certainly not be easy; however, the Court will not deprive the Government of the opportunity to make its case just because it has a hard job ahead.

discussed above, Medco's alleged behavior could have harmed the Government if it reduced the future ability of the Government to spend less on healthcare for its employees. The Government claims that it would have been entitled to any payments for contractual penalties; this is enough to proceed.

### c. The Relators' Drug–Switching Claims

31 U.S.C. § 3730(e)(4) divests courts of jurisdiction from qui tam actions "based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A). "Original source" means "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B). Medco argues that the Relators' drug-switching claims must be dismissed because they were the subject of prior public disclosures, and the Relators are not original sources. The Court agrees that Relators' claims, as they relate to Merck drugs, have been the subject of prior disclosures. Whether Relators are original sources, however, will require the consideration of facts not contained in the Complaints.

To determine whether a qui tam relator's claim is barred by a prior public disclosure, the Third Circuit has instructed courts to perform a four-part analysis. A court must examine whether

(1) there was a public disclosure; (2) of "allegations or transactions" of the fraud; (3) "in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media."; (4) that the relator's action was "based upon." If the relator fails the public disclosure bar, he or she can only establish subject matter jurisdiction if he or she is an "original source" of the information. 31 U.S.C. § 3730(e)(4).

*United States ex rel. Dunleavy v. County of Delaware*, 123 F.3d 734, 738 (3d Cir. 1997).

■ Medco contends that there were four qualifying disclosures undermining the Relators' drug-switching claims: an antitrust complaint brought by the Federal Trade Commission ("FTC") against Medco (*In the Matter of Merck & Co., Inc.*, Docket No. C–3853, *available at* http://www.ftc.gov/os/1998/08/9510097cmp.htm) ("FTC Complaint"), a press release regarding an antitrust settlement between Medco and the FTC (*available at* http://www.ftc.gov/opa/1998/08/merck.htm) ("FTC Press Release"), and two newspaper articles (Robert O'Harrow, Jr., *Regulators are Treading on Uncharted Territory*, The Wash. Post, Sept. 27, 1998, at A27; E. Silverman, *Merck Settles Antitrust Charges Against Its Pharmacy Benefits Unit*, Knight Ridder: The Star–Ledger, Aug. 28, 1998, 1998 WL 16334464).[12] Each of these documents report allegations of fraud (by the FTC and by state attorneys general) that are contemplated by Plaintiffs' Complaints.[13]

---

**12.** The Court takes judicial notice of the facts contained in these documents.

**13.** Relators urge that a press release cannot form a public disclosure, because the types of

disclosures governed by § 3730(e)(4) is exhaustive. *Dunleavy*, 123 F.3d at 744. It is true that this list is exhaustive—but the list includes "news media"—meaning that, if a

In *Dunleavy* the Third Circuit approved of a test for examining public disclosures. "If X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the [fraud] publicly, the combination of X and Y must be revealed, from which the readers or listeners may infer Z, i.e. the conclusion that fraud has been committed." *Dunleavy*, 123 F.3d at 740–41 (internal citations omitted). Relators' claims are in ¶ 69–87 of the Relators' Complaint, and Relator Piacentile's claims appear throughout his Complaint.

The crux of Hunt and Gauger's drug-switching allegations are that Medco wrongly favored Merck and Merck allies, and that the result of this behavior was to raise healthcare costs and endanger patient life.[14] Hunt and Gauger allege that Medco fraudulently induced physicians to alter their prescriptions, and by misleading patients. "Z," therefore, would be that (1) Medco fraudulently induced drug-switches while (2) maintaining a legitimate reason for the switch.

As discussed above, Medco has offered four documents as potential public disclosures. Without reaching the issue of whether the FTC Press Release can qualify as a disclosure, the Court is satisfied that the essential components of Relators' drug-switching claims have been disclosed, at least so far as the claims embrace Medco's preference for Merck drugs. The Star–Ledger Story reflects a settlement between Merck (then the parent company of Medco) and the FTC regarding unfair preference to Merck drugs. The Washington Post story notes that, "in 1995, attorneys general in 17 states said Merck & Co. and Merck–Medco Managed Care may have violated consumer protections laws in how they tried to change patient prescriptions to Merck products." Robert O'Harrow, Jr., *Regulators are Treading on Uncharted Territory*, The Wash. Post, Sept. 27, 1998, at A27. Finally, the FTC's antitrust complaint against Merck alleged that "[p]harmaceutical prices are likely to increase and the quality of the pharmaceuticals available to consumers is likely to diminish." *In the Matter of Merck & Co., Inc.*, Docket No. C–3853, *available at* http://www.ftc.gov/os/1998/08/9510 097cmp.htm, at *2. The disclosures, therefore, injected the primary elements of Relators' drug-switching claims into the public domain, at least with respect to Merck brand drugs.

A qui tam action is "based upon" a public disclosure if the disclosure sets out

press release serves its purpose, and it is reported, it could enter the realm of public disclosure. Whether or not the press release is "news media" will turn on questions of fact inappropriate for a motion to dismiss—but the Court will not adopt the rule that, as a matter of law, press releases can never form public disclosures.

**14.** Relators Hunt and Gauger charge that the true purpose of Medco's managed care department is to switch patients to more profitable drugs, and not, as Medco claims, to monitor clinical outcomes and maintain compliance with drug formularies by contacting physicians. *Relators' Comp.* at ¶ 69. Relators complain that Medco's prescription drug formulary is actually populated largely by expensive Merck drugs, despite Medco's representation that the formulary is reviewed by an independent committee to maximize cost-savings. *Id.* at ¶ 74. Relators complain that "[i]n reality and practice, the role of [Medco's] managed care department is to switch patients from a currently prescribed drug to a 'target' drug [manufactured by Merck or a manufacturer who has entered into a lucrative, undisclosed rebate]." *Id.* at ¶ 75. Relators then discuss the specific methods used by Medco to encourage drug-switching, and how Medco allegedly fails to follow up with patients who have been switched. Relators claim that the drug-switching endangers the life of patients and increased medical costs. *Id.* at ¶¶ 83–84.

"allegations advanced in the qui tam action or all of the essential elements of the qui tam action's claims." *United States ex rel. Mistick v. Housing Authority of the City of Pittsburgh et al.*, 186 F.3d 376, 388 (3d Cir.1999). Because the Relators' allegations followed the public disclosures, they can only survive if the Relators are "original sources." [15] 31 U.S.C. § 3730(e)(4)(A). Whether the Relators are original sources will require additional briefing, and examination of several issues of fact. As this additional briefing, and any necessary hearings, will involve questions of fact not answered by the material available to the Court, no further analysis of these claims is possible at this time.

### c. *Anti–Kickback Act Claims*

The Government alleges that Medco violated the AKA by kicking back payments to a health plan in exchange for favorable treatment and by soliciting and accepting kickbacks from drug companies to change patients' prescriptions to their drugs. Medco argues that the AKA does not apply to contracts where the Medicare program is a beneficiary, and that the Government's allegations do not survive Rule 12(b)(6). As discussed below, the Court disagrees with Medco on both points.

### i. *The Anti–Kickback Act*

The Anti–Kickback Act, 41 U.S.C. § 51 *et seq.*, prohibits a person from providing, offering to provide, accepting, or soliciting, any kickback, including those priced into a contract between a subcontractor and a prime contractor. 41 U.S.C. § 53. A kickback is anything of value provided to a prime contractor or its employee, a subcontractor, or a subcontractor's employee, in exchange for favorable treatment in connection with a prime contract. 41 U.S.C. § 52(2). A prime contract is one that is entered into by the United States for the purpose of obtaining supplies, materials, equipment, or services of any kind. 41 U.S.C. § 52(4). A subcontract is a contract between a prime contractor and a subcontractor for supplies, materials, equipment, or services of any kind under a prime contract. 41 U.S.C. § 52(7).

### ii. *The Government's Medicare Claims*

The Government has alleged that Medco kicked back a payment of $87.4 million to a health plan that had entered into an agreement with the Medicare program to provide managed care services. Medco denies that any such wrongful payment took place, and further responds that the AKA cannot apply to contracts involving Medicare.

The Government's Complaint adequately alleges violations of the AKA. The Government has alleged a payment by Medco to the health plan, and pleaded that the payment had no legitimate purpose other then to convince the health plan to favor Medco. (*Gov't Comp.* at ¶ 158, 159). The Government has pleaded scienter sufficient to withstand a motion to dismiss by alleging that Medco knew its conduct was wrong because it had complained to the United States Attorney about a competitor's similar behavior in the summer of 2000. *Gov't Comp.* at ¶ 160. Medco argues that the conduct it is alleged to have complained of is different from the conduct it allegedly engaged in; but the Court will not split hairs on this point, and will ex-

---

**15.** Contrary to the seemingly straight-forward meaning of the statute, the Third Circuit along with most other Courts of Appeals has read "based upon" to mean something other then "based upon." As the Third Circuit so aptly pointed out, this departure from common sense is necessitated by the poor draftsmanship in key sections of the FCA. *Mistick* at 387–88 ("The inescapable conclusion is that the qui tam provision does not reflect careful drafting.").

tend to the Government the benefit of discovery to make its case. Read broadly, the allegation in ¶ 160 of the Government's Complaint seems to fit the conduct the Government complains of—this satisfies the Court that Medco could have known its conduct was wrong, and, in the spirit of notice pleading, the Court will not require further specificity or pleadings by the Government. Finally, the Government has adequately pleaded that Medco was a subcontractor, and that the health plan had a prime contract to furnish the Government with supplies and services. *Gov't Comp.* at ¶ 163, 164. Having pleaded all of the requisite elements of an AKA claim, the Government's claim should proceed.

■■■ Medco claims that the AKA does not reach contracts involving Medicare. Citing *United States v. Kensington Hospital et al.*, 760 F.Supp. 1120 (E.D.Pa.1991), Medco argues that Congress never meant for the AKA to reach the kind of payments at issue in the instant case. The Court disagrees.

In *Kensington*, Judge VanArtsdalen of this Court dismissed the United States' AKA claims against several doctors and a hospital who were engaged in delivering Medicare-subsidized healthcare to the elderly and disabled. The United States had argued that the Hospital's relationship with Medicare was a prime contract, and that the doctors' relationship with the hospital was a subcontract, when in fact no such relationship existed. Rather, both the doctors and the hospital had separate contractual relationships with the United States—meaning that there could be no "kickback" from the doctors to the hospital, because the doctors were not actually subcontractors. *Kensington* at 1139. As an alternative, independent ground for dismissing the AKA claims, Judge VanArtsdalen analyzed the legislative history of the AKA and determined that it was not meant to apply to Medicare programs re-

sembling the one in his case. Judge VanArtsdalen noted that "[I]n a typical case, the United States awards a prime contract to a particular company which decides to subcontract part or all of the work to others. One or more of the potential subcontractors, to obtain favorable treatment in the subcontracting process, offers or provides kickbacks to key personnel [of the prime contractor]." *Id.* at 1140. Judge VanArtsdalen held that "[such a situation is] completely different from the type of relationships that exists in the Medicaid/Medicare context. None of the alleged kickbacks occurred between subcontractors and a prime contractor, or between higher or lower tier subcontractors, or suppliers or sales representatives." *Id.* Of course, the wrongdoing alleged in the instant case is completely different from that in *Kensington*. Here, the Government alleges that Medco, a subcontractor, gave kickbacks to a primary contractor in exchange for favorable treatment—exactly the kind of situation contemplated by the AKA, and by the *Kensington* decision.

This Court will not follow Judge VanArtsdalen's dicta in *Kensington*, to the extent that such dicta mandates a blanket legal conclusion that the AKA can never apply to contracts where the Medicare or Medicaid programs are parties. Judge VanArtsdalen distinguished the kind of conduct alleged in *Kensington* from the activities he found that Congress meant to target with the AKA: "[t]he patterns of behavior that the [committee] reports discuss do not begin to resemble the alleged wrongdoing in this case. The Senate report states that 'kickbacks' include payments between [amongst other things] subcontractors and prime contractors ...." *Id.* at 1140. The allegations in *Kensington* could not have been stretched to engender the kind of conduct discussed by the committee. The conduct complained of in the instant case can. In

*Kensington,* Judge VanArtsdalen held that "[Congress] never intended the Anti–Kickback Act to apply to the wrongdoing alleged in the complaint." *Id.* Plaintiffs here, however, have accused Medco of exactly the kind of conduct that Judge VanArtsdalen could not find in his case. Medco's argument must, therefore, be rejected.

### iii. The Drug Company Claims

■ The Government has also alleged that Medco solicited and received kickbacks from drug manufacturers in exchange for changing patients' prescriptions. Medco takes issue with this claim, arguing that the only improper payments complained of were actually lawfully negotiated drug rebates. This question is one of fact, inappropriate for consideration on a motion to dismiss. Medco argues that the Government has not alleged an illicit purpose for the rebates and other payments—but the Government has. In ¶ 156 of its Complaint, the Government alleges that "certain pharmaceutical manufacturers made improper payments to Medco Health." If the Government's allegations are true, and Medco indeed received payments from drug makers to wrongfully favor their drugs, Government would have viable AKA claims. The Government's allegations are indeed thin—and the Court suspects that, without more, the Government will be unable to save its case on this count from summary judgment. However, given this Court's obligation to extend every favorable inference to a plaintiff defending itself from a motion to dismiss, it is inappropriate to rule against the Government on this point. Medco's Motion on this point will be denied.

### d. Plaintiffs' Common Law Claims

### i. Unjust Enrichment

■ The equitable doctrine of unjust enrichment allows recovery of money that should not be retained when there is no controlling contract. *In re Chateaugay Corp.,* 10 F.3d 944 (2d Cir.1993). The touchstone of an unjust enrichment claim is that the party against whom recovery is sought must have wrongfully received a benefit that would be unconscionable to retain. *Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989 (3d Cir.1987). Plaintiffs allege multiple instances of Medco's agents destroying or falsifying records in order to avoid contractual penalties. *See Gov't Comp.* at ¶ 10–14, 25–40, 46–64 (alleging that Medco's employees falsified records to disguise the company's failure to comply with its performance guarantees). Medco argues that the existence of an express contract precludes Plaintiffs from pursuing quasi-contractual recovery theories. As a statement of law, this is true in the Third Circuit. *Hershey,* 828 F.2d at 999. The Government argues that, because Medco's express contract was with the health plans and not the Government itself, its unjust enrichment claims should be allowed to proceed. At this point, the Court sees no reason to disagree.

As an additional basis for deciding against Medco on this Count, the Court notes that federal rules allow pleading in the alternative. *See Kensington,* 760 F.Supp. at 1135 (refusing to dismiss unjust enrichment claims despite existence of contract). The Government has pleaded allegations which, if true, could allow it to recover for payments it made to health plans who submitted Medco's claims for reimbursement. For these reasons, Medco's Motion is denied.

### ii. Active and Constructive Fraud

Plaintiffs' fraud claims must be dismissed. Despite the fact that the Government has captioned Count Four of its Complaint "Active and Constructive Fraud," it has only made a demand for

recovery based on Medco's constructive fraud. *Gov't Comp.* at ¶ 187. The Government has failed, in the most literal sense, to plead the elements of active fraud in its Complaint, much less make a demand for relief on any such claims. As such, the Court will only deal with the Government's claims of constructive fraud.

■ Fraud requires a showing of "(1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention by the maker to induce the recipient thereby; (4) justifiable reliance by the recipient on the misrepresentation; and (5) damages to the recipient as a proximate result of the misrepresentation." *Crestar Mortgage Corp. v. Shapiro,* No. 95–680, 1995 WL 542228, at *4 n. 1, 1995 U.S. Dist. LEXIS 13149, at *9 n.1 (E.D.Pa. Sep. 7, 1995). To state a claim for constructive fraud, a plaintiff must plead the above elements, and additionally show that some special relationship between itself and a defendant gave rise to a heightened legal duty between the parties. *Id.* at *13, 1995 WL 542228 at *4

■ The issue is whether Medco owes Plaintiffs a heightened legal duty such as to support a claim of constructive fraud. The Court finds that there was no such relationship, and that the Government's constructive fraud claim must be dismissed. To state a claim for constructive fraud, there must be a relationship of trust and confidence between the parties. The Government argues that it has alleged a special relationship between Medco and patients. *Gov't. Comp.* at ¶ 186, 187. But this relationship, as alleged, was between Medco and patients of the health plans—*not* between Medco and Plaintiffs. Although Plaintiffs may be able to allege that Medco's acts amount to common law fraud, there is no allegation that Medco and the Government enjoyed a relationship of trust and confidence giving rise to constructive fraud. The only allegations, in this re-

gard, relate to Medco's relationship with patients, carriers, physicians, and the public—and this is not enough to sustain a claim for constructive fraud brought by the Government, who is none of the aforementioned individuals or entities.

*iii. Payment by Mistake of Fact*

■ Medco argues that Plaintiffs' payment by mistake of fact claim must fail because the Complaints lack any allegation that it was Plaintiffs who directly paid Medco, hanging its hat on the shaky nail of one word in a 1946 Third Circuit decision stating that recovery under this theory is only allowed if "the defendant would be unjustly enriched by the retention of the plaintiff's money and, therefore, should in equity and good conscience return it." *Wilson & Co. v. Douredoure,* 154 F.2d 442, 445 (3d Cir.1946). Lacking any nexus between Medco's receipt of payments from health plans, and the Government's contribution of those payments, Medco urges, the claim must be dismissed. As discussed above, the Government has alleged facts which indicate that it reimbursed Blue Cross for actual claims paid—meaning that, even if payments to Medco were filtered through a health plan, the money, or some portion of it, was ultimately paid by the Government. To deprive the Government of the ability to demand a refund, given this fact, would be unjust, and would defeat the principles of equity that the Third Circuit meant to uphold in *Wilson. See id.* at 446 ("it has been stated by the Pennsylvania courts that the object in proceedings for restitution is the prevention of unjust enrichment of the defendant and the securing for the plaintiff of that to which he is justly and in good conscience entitled." (Internal citations omitted)). In the instant case, if it is true that the Government and not Blue Cross would be entitled to all of the monies wrongly paid to Medco, and all of the monies which

Medco wrongly avoided paying, then the Government has standing under this doctrine. It is, after all, justly and in good conscience entitled to said payments, if Plaintiffs' recitation of the function of the FEHBP bears true.[16]

As to Medco's other argument on this point, that equitable remedies are inappropriate when legal remedies exist, the Court will not accept the argument at this time. In *United States v. Hydroaire, Inc.*, No. 94–4414, 1995 WL 86733, 1995 U.S. Dist. LEXIS 2306 (N.D.Ill. Feb. 27, 1995), cited by Medco, the Government's equitable claims were dismissed because the Government pleaded fraud and the existence of a contract. First, the facts in *Hydroaire* were different then those of the instant case, and second, that court made its decision based on Illinois law. Dismissal may be appropriate eventually—but it is not yet clear whether the FCA and AKA will be sufficient to remedy the wrongs that Plaintiffs complain of. For the reasons stated above, Medco's Motion on this Count is denied.

## IV. Conclusion

The Court denies Medco's Motion to Dismiss Plaintiffs' FCA claims, Medco's Motion to Dismiss the Government's AKA claims, and denies in part and grants in part Medco's Motion to Dismiss Plaintiffs' Common Law claims. Plaintiffs' active and constructive fraud claims (Count IV) will be dismissed. All Motions to Exceed Page Limits will be granted. All Motions to File Replies and Sur–Replies will be granted.

An Order follows.

## *ORDER*

AND NOW, this day of September, 2004, upon consideration of Medco's Mo-tion to Dismiss the Plaintiffs' Complaints (Doc. 78), the Plaintiffs' Responses, and the Parties' Replies and Sur–Replies, it is hereby ORDERED as follows:

1. All Motions to Exceed Page Limits and to File Replies and Sur–Replies (Doc. 77, 97, 99, 116, 145) are GRANTED.

2. Medco's Motion to Dismiss (Doc. 78) is GRANTED in part and DENIED in part. For the reasons discussed in this Court's Opinion, Count Four of the Government's Complaint is DISMISSED.

3. Medco's Motion to Dismiss the Relators' Drug–Switching Claims is GRANTED in part and DENIED in part. For the reasons discussed in this Court's Opinion, the Court finds that the drug-switching claims (insofar as they relate to Merck drugs) were publicly disclosed prior to the filing of Relators' Complaints. The Parties shall submit to this Court a joint proposed schedule for briefing on the issue of whether Relators are original sources.

AND IT IS SO ORDERED.

---

**16.** The actual amount that the Government may recover here is, of course, limited to that amount that it, as distinct from its employees, actually overpaid—an amount which may be both difficult to prove and comparatively small.