# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 29, 2026

Lyle W. Cayce
Clerk

No. 25-40368

UNITED STATES OF AMERICA *ex rel.* JACK PALMER, JR., *on behalf of the United States of America*,

> *Plaintiff—Appellant*,

*versus*

TATA CONSULTING SERVICES, LTD.,

> *Defendant—Appellee*.

Appeal from the United States District Court
for the Eastern District of Texas
Civil Action No. 4:17-CV-72

Before WILLETT, WILSON, and DOUGLAS, *Circuit Judges*.

CORY T. WILSON, *Circuit Judge*:

After auditing Tata Consulting Services, Ltd. and its immigration practices, Jack Palmer initiated this *qui tam* action under the False Claims Act (FCA). Palmer alleged that Tata fraudulently acquired thousands of visas for foreign workers and underpaid visa-dependent employees in violation of federal law. Given the FCA's requirements for recovery, Palmer framed his allegations as "reverse false claims," *i.e.*, a failure by Tata to transmit money owed to the federal government, by paying for cheaper visas under false pretenses and by failing to withhold taxes on the required higher wages for

certain visa recipients.  The district court rejected both theories of liability and dismissed Palmer's complaint for failure to state a claim.  Because Palmer has not alleged any obligation of Tata to transmit money to the Government, he fails to allege an actionable claim under the FCA, and we affirm the judgment of the district court.

## I.

In 2016, Comcast hired Jack Palmer to audit Tata Consulting Services, Ltd. and its immigration practices.  Tata is a major IT and professional services firm, based in India but with significant operations in the United States.  Tata employs roughly 30,000 workers in the United States, about 75% of whom require either an H-1B visa, an L-1A visa, or a B-1 visa.  Because the differences between these visa types are pertinent to Palmer's claims, we briefly sketch each type.

**H-1B visas** are intended for temporary workers in specialized fields where the supply of qualified Americans is inadequate to meet employer demand.  *See* 8 C.F.R. § 214.2(h)(1)(ii)(B).  To acquire an H-1B visa, an employer must file an application with the Department of Labor certifying that the foreign worker's role presently exists and remains to be filled.  *See* 20 C.F.R. § 655.730.  The employer must further certify that the visa recipient will be paid the higher of (a) wages paid to similarly situated American employees or (b) the prevailing rate for the intended role.  *See id.* § 655.731(a).  Even after making this application, receiving an H-1B visa is not a certainty:  The number of visas available each year is strictly capped, and applicants are subject to a lottery system.  *See* 8 U.S.C. § 1184(g)(1)(A); 8 C.F.R. § 214.2(h)(8)(iv)(B).  According to Palmer's complaint, the total fees payable for Tata to procure each H-1B visa during the relevant period would have been $6,460.

**L-1A visas** permit the cross-border transfer of managers within a company, subject to certain requirements. *See* 8 C.F.R. § 214.2(*l*)(1)(i), (ii)(A). The L-1A application process is more relaxed than the H-1B equivalent; there is no lottery, annual cap, or wage requirement. *Id.* Palmer alleges that the cost to Tata for each L-1A visa would have been $5,460.

**B-1 visas** are for short-term visitors. These visas allow workers to enter the United States for up to a year to conduct certain business activities, with no annual cap or lottery system. *See id.* § 214.2(b)(1). Palmer alleges that Tata would only have paid a $160 application fee to obtain each B-1 visa.

Palmer alleges that his 2016 audit uncovered numerous forms of visa fraud by Tata. Relevant to this appeal, Palmer alleges that, in order to circumvent the stricter requirements for H-1B visas, Tata applied for L-1A visas for non-managerial employees and then assigned L-1A recipients to skilled labor properly reserved for H-1B holders. Similarly, Palmer alleges that Tata applied for and received a large number of B-1 visas, using these visa holders for both skilled and unskilled labor in violation of federal law. To avoid detection by immigration officials, Palmer asserts that Tata retroactively edited visa holders' personnel files to comport with the visas they held, even if those classifications conflicted with employees' actual roles or the work they performed. He further alleges that Tata systematically underpaid H-1B workers relative to American employees in violation of 20 C.F.R. § 655.731(a). According to Palmer, this fraudulent visa scheme drastically inflated the number of visas Tata received, creating a surplus of "visa-ready" workers in India who could be imported to the United States as the need arose.

Palmer filed this *qui tam* action under the FCA in January 2017. After several years of discovery and extensions of the seal period, the United States declined to intervene in August 2022. *See* 31 U.S.C. § 3730(b)(2)–(4).

No. 25-40368

Palmer then opted to continue prosecuting the action on behalf of the United States and submitted an amended complaint in March 2023. *See id.* § 3730(b)(1).

Relevant here, Palmer's amended complaint alleged that Tata had submitted "reverse" false claims under the FCA.[1] A "reverse" false claim, as the name suggests, arises when a defendant "improperly avoids or decreases an obligation to pay or transmit money or property *to* the Government," as opposed to taking money fraudulently *from* the Government. *Id.* § 3729(a)(1)(G) (emphasis added). Palmer contends that Tata avoided its obligations in either (or both) of two ways: (1) Tata applied for B-1 and L-1A visas instead of the proper H-1B visas, allowing the company to pay lower visa fees to the federal government; and (2) Tata systematically underpaid visa recipients in violation of 20 C.F.R. § 655.731, and so necessarily withheld less for federal payroll taxes.

Tata moved to dismiss Palmer's claims under Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion and dismissed all of the claims. The court dismissed Palmer's "reverse" FCA claims based on its holding that Tata had no "obligation to pay or transmit money" for visas Tata never applied for, nor any obligation to withhold taxes on wages that were never paid to workers. *Id.* This appeal followed.

---

[1] Palmer's amended complaint also alleged two types of "affirmative" false claims, asserting that (1) Tata "knowingly present[ed] . . . a false or fraudulent claim for payment or approval" by using false information to obtain visas; and (2) Tata used "false record[s] or statement[s] material to a false or fraudulent claim" in carrying out this fraud. 31 U.S.C. § 3729(a)(1)(A)–(B). The district court dismissed these claims, concluding that the visas Tata acquired were not the Government's "money or property" within the meaning of the FCA. *Id.* § 3729(b)(2)(A). Palmer appeals only the dismissal of his "reverse" FCA claims.

No. 25-40368

## II.

"A dismissal pursuant to Rule 12(b)(6) is reviewed *de novo*." *Hinkley v. Envoy Air, Inc.*, 968 F.3d 544, 552 (5th Cir. 2020). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). Dismissal is proper if "it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief." *U.S. ex rel. Thompson v. Columbia HCA/Healthcare Corp.*, 125 F.3d 899, 901 (5th Cir. 1997). And a claim for relief may be foreclosed "on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

## III.

We begin by reviewing the FCA's operative legal standards and how Palmer's allegations fit within that framework. We then address each of Palmer's theories of liability in turn.

### A.

The FCA imposes liability on those who defraud the federal government by submitting false or fraudulent claims for the Government's money or property. 31 U.S.C. § 3729 *et seq.* The FCA is "enforced not just through litigation brought by the Government itself, but also through civil *qui tam* actions that are filed by private parties [such as Palmer], called relators, in the name of the Government." *U.S. ex rel. Conyers v. Conyers*, 108 F.4th 351, 354 (5th Cir. 2024) (quotation omitted).

But the FCA "is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 194 (2016) (quoting *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 672 (2008)).

5

Rather, the FCA "attaches liability, not to the underlying fraudulent activity, but to the claim for payment. Therefore, a central question in [FCA] cases is whether the defendant ever presented a false or fraudulent claim to the [G]overnment." *U.S. ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 381 (5th Cir. 2003) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999)) (internal ellipsis and quotation marks omitted). In short, even if Palmer's complaint plausibly alleges that Tata committed visa fraud, to trigger FCA liability he must allege that Tata submitted a "false or fraudulent claim" depriving the federal government of "money or property." 31 U.S.C. § 3729(a).

The "prototypical" FCA claims are "those in which the claimant did not perform the service he requests compensation for or did perform the service but overcharged the [G]overnment." *U.S. ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 662 (S.D. Tex. 2013). Put differently, the usual scenario involves a defendant using false pretenses to obtain payment from the Government. But the FCA also imposes liability for the inverse situation, wherein a defendant "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property *to* the Government." 31 U.S.C. § 3729(a)(1)(G) (emphasis added). In such "reverse" false claims, a "defendant's action does not result in improper payment by the [G]overnment to the defendant, but instead results in no payment to the [G]overnment when a payment is obligated." *U.S. ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004).

The central question here is whether Tata was under any "obligation" to pay money to the federal government. 31 U.S.C. § 3729(a)(1)(G). The FCA defines an "obligation" as "an established duty" to pay the Government arising from "an express or implied contractual [relationship]" or "from statute or regulation." *Id.* § 3729(b)(3). Thus, if Tata was contractually bound to pay the Government, that would be an "obligation."

*See Bain*, 386 F.3d at 657. Likewise, if federal law or regulations obligated Tata to transmit money to the Government, failure to do so would give rise to FCA liability. *See U.S. ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1037 (5th Cir. 2016) (Obligations "can arise from a list of sources, including statutes and regulations.").

However, "obligations to pay that are merely potential or contingent" cannot create reverse false claim liability. *U.S. ex rel. Barrick v. Parker-Migliorini Int'l, L.L.C.*, 878 F.3d 1224, 1231 (10th Cir. 2017); *accord U.S. ex rel. Marcy v. Rowan Cos.*, 520 F.3d 384, 391–92 (5th Cir. 2008) (rejecting "potential or contingent obligations to pay . . . fines or penalties" under environmental laws as "legally insufficient to make a reverse false claim" (quoting *Bain*, 386 F.3d at 657)). Rather, there must be an "established duty to pay" the federal government, and that debt must be "immediately due." *Simoneaux*, 843 F.3d at 1037, 1039 (quoting *United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 774 (8th Cir. 1997)); *see also United States v. LabQ Clinical Diagnostics, L.L.C.*, 771 F. Supp. 3d 401, 437 (S.D.N.Y. 2025) ("A duty to pay is 'established' for a reverse FCA claim 'only when it triggers an immediate and self-executing duty to pay." (quoting *Miller v. U.S. ex rel. Miller*, 110 F.4th 533, 546 (2d Cir. 2024)). In other words, it is not enough for Palmer to allege that some "potential or contingent" event would obligate Tata to pay money to the federal government. *Bain*, 386 F.3d at 657. To survive dismissal under Rule 12(b)(6), Palmer must show that Tata had a "present duty" to pay the Government and failed to do so while that obligation was ongoing. *Q Int'l Courier*, 131 F.3d at 773; *see also Simoneaux*, 843 F.3d at 1037, 1039.

## B.

Mindful of these requirements, we turn to the theories of liability that undergird Palmer's claims. He asserts that (1) Tata was obligated to pay the

No. 25-40368

Government higher fees for visas that would accurately reflect the work that Tata's visa holders would perform, and (2) federal law required Tata to pay visa-dependent employees higher wages, which necessarily required Tata to withhold more in federal payroll taxes.

**1.**

Palmer first alleges that federal labor regulations obligated Tata to pay fees for H-1B visas in instances when Tata knew that H-1B visas would be appropriate for the work that visa recipients would perform.[2] Consequently, his argument goes, Tata improperly avoided this obligation by applying and paying for cheaper L-1A or B-1 visas. *See* 31 U.S.C. § 3729(a)(1)(G).

Palmer discerns this obligation from regulations requiring submission of an accurate application to the Department of Labor as part of the H-1B approval process, as well as the submission of appropriate fees based on the visa type being sought. *See* 8 C.F.R. § 214.2(h)(2)(i)(A) ("United States employer[s] seeking to classify an alien as an [H-1B] temporary employee must file a petition on the form prescribed by USCIS in accordance with the form instructions."); *see also* 20 C.F.R. § 655.730(a) ("An employer [that] intends to employ an H-1B nonimmigrant in a specialty occupation . . . shall submit an [application] to the Department."); 8 C.F.R. §§ 106.1(a), 106.2 (requiring payment of appropriate fees).

But the regulations Palmer cites merely require payments corresponding to the visas *actually sought*; they create no freestanding

---

[2] Palmer contends, somewhat unclearly, that Tata's use of the visa system placed it in either a "regulatory," "fee-based," or "contractual or implied contractual" relationship with the Government, obligating Tata to pay for accurate visas. *See* 31 U.S.C. § 3729(b)(3). But any such obligation, as Palmer articulates it, could only have been created by federal labor regulations. Because the relevant provisions create no such obligation, the exact nature of Tata's hypothetical obligation is irrelevant.

obligation to pay fees for a specific visa type. *See* 8 C.F.R. §§ 106.1, 106.2(a)(3), 214.2(h)(2)(i)(A); 20 C.F.R. §§ 655.700(b)(2), 655.730(a). And as the district court aptly observed, payments for more expensive H-1B visas were merely contingent on Tata actually applying for those visas and then receiving them via the lottery process. Thus, Tata had no "established" duty to pay higher visa fees corresponding to visas for which it never applied. 31 U.S.C. § 3729(b)(3).

Palmer further contends that, if Tata took on employees using other visa types and then assigned them to perform work appropriate for H-1B recipients, then Tata was required to file new or amended visa petitions, along with the appropriate fees, to correct that discrepancy. *See* 8 C.F.R. § 214.2(h)(2)(i)(E), (*l*)(7)(i)(C) (requiring new or amended petitions in response to changed circumstances affecting an earlier visa petition). Palmer reasons that Tata triggered an immediate obligation to pay higher visa fees to the federal government once the company began using non-H1-B visa holders to perform work suited only for H-1B recipients.

Palmer's contention here rests on similarly weak footing. The regulations requiring new or amended petitions due to changed circumstances only obligate employers to adjust their earlier petitions for visas of the *same type*; they do not require application for a new type of visa. *See id.*[3] Thus, while Tata remained bound to abide by federal immigration law, the company had no "obligation" per the FCA to apply and pay for new

---

[3] Moreover, amendment is designed to address an unexpected change in circumstances affecting a visa petition, not to cure a purportedly fraudulent application. *See* 8 C.F.R. § 214.2(h)(2)(i)(E), (*l*)(7)(i)(C). Indeed, it is unclear whether Tata would even be allowed to amend a fraudulent petition, as opposed to having its visas and pending petitions simply revoked. *See id.* § 214.2(h)(11)(iii)(A), (*l*)(9)(iii)(A).

visas when it allegedly used non-H1-B recipients to perform work reserved for H-1B holders.

Taken together, the relevant regulations impose no "obligation to transmit money or property to the Government" giving rise to reverse false claim liability, as every circuit court to address this question has held. The D.C. Circuit, in a case involving not only similar claims but the same defendant, concluded that the "requirement to pay the correct fee for the visa application submitted does not create an FCA obligation. [The relevant] immigration regulations . . . only oblige employers to pay fees on the visas for which they applied." *U.S. ex rel. Kini v. Tata Consultancy Servs., Ltd.*, 146 F.4th 1184, 1194 (D.C. Cir. 2025). Likewise, the Second Circuit determined that "an obligation to pay higher visa application fees does not exist by the mere fact of a violation of immigration laws because that violation does not trigger an immediate and self-executing duty to pay the [G]overnment those fees." *U.S. ex rel. Billington v. HCL Techs. Ltd.*, 126 F.4th 799, 805 (2d Cir. 2024) (quotation and alterations omitted); *see also U.S. ex rel. Handloser v. Infosys Ltd.*, No. 4:20-CV-275, 2025 WL 2029862, at *6 (E.D. Tex. July 21, 2025) (same). And the Ninth Circuit straightforwardly held that "it [was] not sufficient that defendants applied for the wrong visas or may face liability for violating applicable regulations. They had no 'established duty' to pay for visas for which they did not apply." *U.S. ex rel. Lesnik v. ISM Vuzem d.o.o.*, 112 F.4th 816, 820 (9th Cir. 2024) (quoting 31 U.S.C. § 3729(b)(3)).

Palmer does not address this chorus of contrary authorities.[4] Instead, he relies extensively on the sole district court decision to impose FCA

---

[4] Palmer obliquely contests the applicability of *Lesnik*, arguing that the district court opinion affirmed on appeal in that case relied on an outdated requirement that obligations be a "fixed sum." *See Lesnik v. Eisenmann SE*, 374 F. Supp. 3d 923, 940 (N.D.

liability on a defendant that failed to apply and pay for appropriate visas. *See Franchitti v. Cognizant Tech. Sols. Corp.*, 555 F. Supp. 3d 63, 71 (D.N.J. 2021). The *Franchitti* court held that a cognizable FCA "obligation" accrued upon the submission of inaccurate visa applications. *Id.* However, that court arrived at this conclusion based on precedent involving reverse false claims outside the visa context; the court never so much as cited the labor regulations that purportedly give rise to Tata's obligation in this case. *Id.* at 70–71. *Franchitti*'s reasoning has also been roundly rejected by every court to contemplate it. *See Kini*, 146 F.4th at 1194 ("*Franchitti* . . . lack[s] persuasive value."); *Billington*, 126 F.4th at 805 n.5 (same); *Lesnik*, 112 F.4th at 820 (*Franchitti* "never identified any legal authority that would establish . . . an obligation[.]"); *see also Handloser*, 2025 WL 2029862, at *6 ("[T]he *Franchitti* court's conclusion has proven to be an outlier, unsupported by prior precedent and uniformly rejected by courts across the country[.]"). And the Third Circuit itself recently granted interlocutory review of the *Franchitti* decision. *See* Order, No. 25-8042, *Franchitti v. Cognizant Tech. Sols. Corp.* (3d Cir. Mar. 4, 2026).

We are likewise unpersuaded. The precedents treated by *Franchitti* as analogous are simply inapposite. First, in *Pemco Aeroplex*, an airplane maintenance company underpaid the Air Force for some obsolete equipment, and this underpayment was treated as improper avoidance of an "obligation" to pay the correct amount. *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1236–38 (11th Cir. 1999). But that company's government contract expressly required it to value the equipment correctly before making an offer to the Government, a contractual duty that was violated when the company misrepresented the value of the Air Force's property. *Id.* at 1235–

---

Cal. 2019). But this reasoning did not guide the Ninth Circuit's analysis, nor does it have any bearing on our decision in this case.

37.  In this case, no equivalent contractual duty compelled Tata to pay for alternative visas without actually applying for those visas.

Likewise, *Franchitti*'s treatment of *U.S. ex rel. Customs Fraud Investigations, L.L.C. v. Victaulic Co.*, 839 F.3d 242 (3d Cir. 2016), offers no support for Palmer's position.  In *Victaulic*, an importer took in millions of pounds of improperly marked foreign pipe fittings, and the court determined that the firm was obligated to pay the marking duty once the improperly marked goods entered the country.  *Id.* at 253–56.  The relevant customs law in *Victaulic* plainly required immediate payment of the marking duty, a duty the defendant ignored, *see id.*, whereas the labor regulations relevant here required Tata to pay higher visa fees *only after* applying for the corresponding visas—something Tata never did.

The same goes for *U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189 (10th Cir. 2006).  In *Conagra*, a meat exporter violated federal law by failing to apply and pay for replacement export certificates after discovering that its certificates were erroneous.  *Id.* at 1192–93, 1198–99.  Analogizing to *Conagra*, Palmer proposes that Tata was similarly required to apply and pay for new visas once the company began assigning non-H-1B recipients to perform H-1B jobs.  But in *Conagra*, USDA regulations clearly required new applications and payment when errors were discovered, a duty that the Tenth Circuit later characterized as arising "automatically."  *Barrick*, 878 F.3d at 1232–33.  The labor regulations at issue in this case impose no equivalent requirement to make new applications or pay additional fees.

At bottom, while Tata was obligated under federal law to apply for accurate visas, its duty to pay higher fees was contingent on first applying for visas that required those fees.  Given that contingency, Palmer's allegation that Tata failed to pay higher fees for visas for which it never applied cannot be grounds for reverse false claim liability.

**2.**

Palmer also alleges that Tata systematically paid visa-dependent employees less than domestic workers, violating federal regulations requiring that H-1B recipients be paid wages equivalent to those of non-visa workers. *See* 20 C.F.R. § 655.731(a). According to Palmer, this underpayment translated into Tata's avoidance of an "obligation to . . . transmit money" to the Government because the payment of lower wages necessarily led Tata to withhold lower amounts for federal payroll taxes. 31 U.S.C. § 3729(a)(1)(G).

Complicating Palmer's argument is the FCA's "tax bar," which flatly prohibits relators from basing an FCA claim on tax violations. *See* 31 U.S.C. § 3729(d) ("[The FCA] does not apply to claims, records, or statements made under the Internal Revenue Code."). Accordingly, Palmer makes the more indirect argument that the payment of the *correct* taxes on *incorrect* wages, rather than the wages mandated by federal law, necessarily cheated the Government of money that Tata was required to transmit.

Palmer's second theory of recovery stalls out of the gate, as the regulations at issue do not impose any "obligation to transmit money or property" to the Government. 31 U.S.C. § 3729(a)(1)(G). Rather, the relevant regulations only obligate payments of wages to *employees*. *See* 20 C.F.R. § 655.731(a) ("[T]he required wage rate will be paid *to the H-1B nonimmigrant(s)* . . . on the same basis, and in accordance with the same criteria, as the employer offers to U.S. workers." (emphasis added)). The rules on which Palmer relies merely define "wages paid" to visa recipients and require that payments be "reported to the [IRS] as the employee's earnings" and account for "appropriate" withholding under the Internal Revenue Code (IRC) and the Federal Insurance Contributions Act. 20 C.F.R. § 655.731(c)(2)(ii)–(iii). Other provisions contemplate that deductions "may reduce [wages paid] below the level of the required wage,"

but they impose no independent tax requirements on employers. *Id.* § 655.731(c)(1).

Put simply, the relevant regulations did not obligate Tata to withhold more for payroll taxes without paying corresponding higher wages to its workers. Instead, the regulations required Tata to pay visa recipients certain wages and provided a rubric for calculating qualifying wages with reference to "appropriate" withholding for payroll taxes. *Id.* § 655.731(c)(2)(ii)–(iii). What counts as "appropriate" withholding is determined by the IRC, which only requires withholding on the wages *actually* paid to employees. *See, e.g.,* 26 U.S.C. §§ 3111(a), 3121(a)–(b); 26 C.F.R. § 601.401. Without paying higher wages to workers, Tata was thus not required to withhold more in taxes. *See Compaq Computer Corp. v. Commissioner*, 277 F.3d 778, 783 (5th Cir. 2001) (The basis for "an employer['s] withholding and paying to the Government income taxes for an employee [is] the full amount [of employee income] before taxes are paid[.]" (first alteration in original)); *Rowan Cos. v. United States*, 624 F.2d 701, 704 (5th Cir. 1980), *rev'd on other grounds*, 452 U.S. 247 (1981) ("If income tax is not due on some payments to employees, it is unnecessary to withhold taxes from those payments.").

Palmer cites 8 U.S.C. § 1182(n)(2)(A) to suggest that the Government could enforce the visa wage requirements to collect lost tax revenue, indicating an independent, ongoing requirement to withhold more in taxes. But this enforcement statute does not help Palmer's case. The Government could only seek to recover from Tata if the Secretary of Labor, after a hearing, determined that Tata had failed to meet its wage obligations for visa recipients. *See id.* § 1182(n)(2)(D). Thus, any requirement for increased withholding by Tata was contingent on a negative finding by the Secretary. Because no such finding was ever made, no "obligation" on Tata's part ever materialized.

Once more, every court to address similar claims has rejected Palmer's tax-related reverse false claim theory. The D.C. Circuit concluded that the provisions Palmer cites for support "compel[] an employer to pay H-1B employees specified wages" but "[do] not force an employer to pay or transmit money or property to the *[G]overnment*." *Kini*, 146 F.4th at 1193 (emphasis added); *see also Billington*, 126 F.4th at 804; *Lesnik*, 374 F. Supp. 3d at 940; *Handloser*, 2025 WL 2029862, at *5. Rightly so. Holding otherwise would transform *every* failure to pay employees the wages required by federal law into a reverse false claim under the FCA. Such an expansive reading flatly contradicts the FCA's language, the Supreme Court's cabining the FCA's reach, and unanimous precedent indicating that unpaid taxes fall outside the scope of the FCA. *See* 31 U.S.C. § 3729(d); *United States v. McNinch*, 356 U.S. 595, 599 (1958) ("[I]t is . . . clear that the False Claims Act was not designed to reach every kind of fraud practiced on the Government."); *U.S. ex rel. Lissack v. Sakura Glob. Cap. Mkts., Inc.*, 377 F.3d 145, 153 (2d Cir. 2004) (The FCA clearly prohibits "actions that, on their face, seek to recover taxes.").

Palmer does not respond to these contrary authorities. Instead, he cites precedents arising from inapt regulatory contexts, such as the duty of healthcare providers to refund Medicare overpayments or the payment of fees for export certificates. *See, e.g.*, *Conagra*, 465 F.3d at 1209; *U.S. ex rel. Schaengold v. Mem'l Health, Inc.*, No. 4:11-cv-58, 2014 WL 6908856, at *1, *11 (S.D. Ga. Dec. 8, 2014). Palmer submits *U.S. ex rel. Frey v. Health Mgmt. Sys., Inc.*, No. 3:19-CV-0920, 2021 WL 4502275 (N.D. Tex. Oct. 1, 2021), for the proposition that Tata's "antecedent" failure to comply with wage requirements does not excuse Tata from its "obligation" to pay withholding taxes based on the proper wages. But *Frey* cannot support this notion. In *Frey*, third-party insurers were plainly required by law to reimburse the federal government under certain federal insurance programs, regardless of

whether other involved parties (such as state Medicaid agencies) had failed to pay those insurers first. *Id.* at *1–2, *12–15. The regulations at issue here impose no equivalent obligation to withhold more in taxes independent of wages paid.

Palmer also points to a raft of administrative cases from the Department of Labor to suggest that 20 C.F.R. § 655.731 imposes an independent duty to pay income tax on the appropriate wages. But these cases merely address the calculation of "wages paid" and what documentation is required; they do not communicate any duty to pay higher taxes without first paying higher wages to employees. *See In re Avenue Dental Care*, No. 07-101, 2010 WL 348304 (DOL Adm. Rev. Bd. Jan. 7, 2010); *In re Bedi*, No. 14-096, 2016 WL 866115 (DOL Adm. Rev. Bd. Feb. 29, 2016); *In re XCEL Sols. Corp.*, No. 12-076, 2014 WL 3886827 (DOL Adm. Rev. Bd. July 16, 2014).

Last, Palmer proffers *U.S. ex rel. Hunt v. Merck-Medco Managed Care, L.L.C.*, 336 F. Supp. 2d 430 (E.D. Pa. 2004), in arguing that Tata may be liable not only for failing in its direct obligations to the Government, but also for any "actions [leading to] the predictable consequence of depriving the Government of money it was owed." *Id.* at 444. *Hunt* concerned a pharmacy benefit manager that was obliged by contract to pay penalties to an intermediary when its pharmacies failed to fill prescriptions for patients on federal insurance plans, payments that would necessarily be passed on to the Government. *Id.* at 445. By contrast, Tata was not required to withhold taxes on wages it never paid to employees.

Palmer alleges a clever bank shot theory of liability in his effort to avoid the FCA's "tax bar." But he provides no regulatory, statutory, or precedential authority substantiating that Tata had an "obligation" to

No. 25-40368

withhold more in taxes without first paying higher wages to workers. Thus, Palmer fails to allege an actionable reverse false claim under the FCA.[5]

\* \* \*

Palmer's theories of reverse false claim liability fail. The pertinent labor regulations did not obligate Tata to pay for visas for which the company never applied, nor to withhold taxes on wages that were never paid. Thus, Palmer fails to allege an actionable claim under the FCA, such that dismissal was proper.

The judgment of the district court is

AFFIRMED.

---

[5] In view of this conclusion, we need not address the parties' arguments in the alternative concerning whether the FCA's "tax bar" separately forecloses Palmer's claims.